(937 P.2d 446)

No. 73,378

STATE OF KANSAS, *Appellee*, v. EDUARDO RODRIQUEZ-GARCIA, *Appellant*.

Opinion filed April 25, 1997.

*B. Kay Huff*, special appellate defender, and *Steven R. Zinn*, deputy appellate defender, for appellant.

*Steven J. Obermeier* and *Debra A. Vermillion*, assistant district attorneys, *Paul J. Morrison*, district attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before ELLIOTT, P.J., GREEN, J., and JOHN E. SANDERS, District Judge, assigned.

GREEN, J.: Eduardo Rodriquez-Garcia appeals from his convictions for attempted second-degree murder, aggravated burglary, attempted theft, and criminal damage to property. On appeal, Rodriquez-Garcia contends: (1) that the trial court erred in denying his motion for a mistrial based upon the prosecutor's improper comments during closing argument challenging the credibility of the State's main witness because of her decision to take an oath at the preliminary hearing and to affirm at trial and (2) that the trial court

erred in denying his request for an instruction on aggravated assault as a lesser included offense of attempted second-degree murder. We conclude that the trial court erred in failing to grant Rodriquez-Garcia's motion for a mistrial based on the prosecutor's improper comments. We further conclude that because aggravated assault is not a lesser included offense of attempted second-degree murder, Rodriquez-Garcia was not entitled to such an instruction. Accordingly, we affirm in part, reverse in part, and remand this case for a new trial.

Rodriquez-Garcia and his codefendant, Pedro Sanchez, were tried together. Sanchez' former girlfriend, Viola Jackson DeFlores, was the victim and the State's main witness. Because DeFlores was a reluctant trial witness, she appeared under a material witness bond.

At trial, DeFlores' testimony against Rodriquez-Garcia and Sanchez was less incriminating than her earlier police statement and preliminary hearing testimony. Consequently, the State attempted to impeach DeFlores by questioning her about her prior inconsistent statement and her preliminary hearing testimony. DeFlores explained that the discrepancies in her police statement were due to her consumption of alcohol the evening of the incident and to her anger immediately after the incident. DeFlores testified that these things caused her to exaggerate.

However, in closing argument, the prosecutor presented an alternative explanation for the discrepancies in DeFlores' testimony. The prosecutor proposed that Sanchez had persuaded DeFlores to change her story. In support of this theory, the prosecutor pointed out that DeFlores had sworn to tell the truth at the preliminary hearing but only affirmed her testimony at trial. The prosecutor theorized that DeFlores had affirmed because she knew she was not going to tell the truth at trial. When Rodriquez-Garcia objected to this argument, the trial court found that the State was within its wide latitude to comment upon and to interpret the evidence. The objection was overruled, and the prosecutor continued in the same vein. Rodriquez-Garcia moved the court for a mistrial and later moved for a new trial, but the trial court denied both motions.

First, Rodriquez-Garcia argues that the prosecutor's argument that affirmed testimony was somehow less credible than sworn testimony was an impermissible attack upon DeFlores' credibility, as well as a misstatement of the law which misled the jury. Rodriquez-Garcia further argues that the prosecutor's statements contravene K.S.A. 60-418, which provides for testimony under oath *or* affirmation, and K.S.A. 60-430, which expressly forbids the assessment of a witness' credibility according to religious belief. K.S.A. 60-430 provides: "Every person has a privilege to refuse to disclose his or her theological opinion or religious belief *unless his or her adherence or nonadherence to such an opinion or belief is material to an issue in the action other than that of his or her credibility as a witness.*" (Emphasis added.) Rodriquez-Garcia argues that the prosecutor's comments impermissibly attacked DeFlores' exculpatory trial testimony and prejudiced the jury such that he was denied a fair trial.

On the other hand, the State argues that its comments with regard to DeFlores' decision to affirm at trial after taking an oath at the preliminary hearing were well within the latitude given during closing argument. The State argues that DeFlores' testimony was clearly inconsistent, that her decision to affirm was of factual significance, and that the prosecutor's comments were merely an interpretation of those facts for the jury. Moreover, the State argues that the trial court's instruction to the jury that the prosecutor's remarks in this area were not to be considered as evidence had a curative effect if the prosecutor's remarks were improper. Alternatively, the State argues (1) that its comments did not constitute error because they were made in response to defense counsel's inference that DeFlores had testified truthfully and had not succumbed to the State's pressure and (2) that its comments were not so prejudicial as to amount to reversible error.

Consequently, the issue we must decide is whether Rodriquez-Garcia was denied a fair trial because of the so-called improper remarks made by the prosecutor during closing arguments. In *State v. Collier*, 259 Kan. 346, 354, 913 P.2d 597 (1996), our Supreme court reviewed a similar issue and set out the following standard of review:

"The analysis of the effect of a prosecutor's allegedly improper remarks is a two-step process. First the appellate court determines whether the remarks were outside of the considerable latitude the prosecutor is allowed in discussing the evidence. This analysis commences with the holding that '[i]n criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as it is consistent with the evidence adduced.' *State v. Duke*, 256 Kan. 703, Syl. ¶ 5, 887 P.2d 110 (1994). We further held in *State v. Baker*, 219 Kan. 854, Syl. ¶ 9, 549 P.2d 911 (1976), that '[c]ounsel may appeal to the jury with all the power and persuasiveness his learning, skill and experience enable him to use.'

"The second portion of the analysis is that if the remarks are found to be improper, this court must consider whether in light of the record as a whole they are so prejudicial as to amount to reversible error. 'Each case must be scrutinized on its particular facts to determine whether a trial error is harmless error or prejudicial error when viewed in the light of the trial record as a whole, not whether each isolated incident viewed by itself constitutes reversible error.' *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994).

"The review which we make is governed by the following standard: 'Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial.' *Whitaker*, 255 Kan. 118, Syl. ¶ 7. 'In deciding whether improper remarks by the prosecution during closing argument constitute harmless error, the reviewing court must be able to find that the error had little, if any, likelihood of changing the result of the trial. Such a belief must be declared beyond a reasonable doubt.' *State v. Gibbons*, 256 Kan. 951, Syl. ¶ 9, 889 P.2d 772 (1995)."

Emphasizing that DeFlores took an oath before testifying at the preliminary hearing, the prosecutor examined DeFlores as follows:

"Q. Now at the previous time that you testified, you took the oath and swore to God; true?

"A. That is correct.

"Q. And today you're affirming?

"A. That is correct. And the reason for that—

"Q. You just need to answer my question.

"[DEFENSE COUNSEL]: Objection, your Honor. Witness should be allowed to finish the question prosecutor has asked.

"THE COURT: What was the question?

"[PROSECUTOR]: Question was, 'And today you're affirming, is that correct?'

"THE COURT: She answered the question and you can inquire on cross."

At various other times, the prosecutor questioned DeFlores about her oath, which required her to swear to God, as follows:

"Q. Okay. And you recall testifying under oath when you swore to God that you opened the door with both locks and walked in?

"A. Yes.

. . . .

"Q. And at the preliminary hearing, were these comments that you made after you had sworn—

"A. Yes.

"Q. —to God under Oath?"

In telling the jury that DeFlores was attempting to assist the defendants by changing her testimony during the first phase of closing arguments, the prosecutor stated:

"We have provided to you the tools that you can use to find Defendant Sanchez guilty of all those crimes beyond a reasonable doubt. . . . It's not really that hard, because while Ms. [DeFlores] came in here with the intent to assist these defendants for whatever reason—

"[SANCHEZ' COUNSEL]: Judge, I will object. There has been no evidence to that effect, that she has come in here and purposely tried to assist these defendants.

"THE COURT: Your objection is noted and jury has the instruction and anything that is not supported by evidence in this matter, statements of counsel, you can disregard and find they're not supported by the evidence. Let's proceed.

"[PROSECUTOR]: Thank you. While Ms. Jackson came in here with the obvious intent of trying to assist these defendants in escaping the responsibility for the incidents that they were involved in on February 3rd, 1994, she did not do it. She didn't make it. She didn't make it."

Next, defense counsel addressed the jury. The State argues that the following portion of defense counsel's closing argument opened the door to the State's later rebuttal comments:

"[I]f the State brings a witness on and the witness says something different that the State says ought to be said under oath, then the State feels that you should just disregard what she says under oath, folks, take what she says back on February 3rd, 1994 after she had been out that night drinking, at times when there was a struggle and she was angry at her former boyfriend, take that testimony, because we don't like what came from the witness stand. We don't like what was said under oath. You know, we even brought her in here, we arrested her to bring her in here. We thought maybe she would say, we arrested her and put her in jail, she would say what we wanted her to say. We wanted her to say what she said back here when she wasn't under oath. What she really wanted her to say, what the State really wanted her to say is exactly what was said then. And I have to commend Ms. Viola DeFlores for not buckling under the pressure that was placed

upon her. She was arrested. She came here against her will. She was placed on the stand. She was humiliated by the District Attorney, 'You're lying,' she says. 'You're not telling us the truth.' She is under oath. Under the penalty of going to jail. And don't listen to that folks. That is what the DA is saying."

We disagree with the State's contention that the defense counsel's closing argument opened the door for the State to make rebuttal comments comparing DeFlores' oath testimony with her affirmation testimony. From our reading of this argument, the defense counsel was simply telling the jury that DeFlores was obligated to tell the truth whether she took an oath or affirmed. We find that defense counsel's argument was proper because K.S.A. 54-103 states that "[a]ny person having conscientious scruples against taking an oath, may affirm with like effect." Moreover, K.S.A. 54-105 provides that "[a]ll oaths and affirmations alike subject the party who shall falsify them to the pains and penalties of perjury."

Comparing DeFlores' preliminary testimony when she took an oath with her trial testimony when she affirmed, the State made the following rebuttal argument:

"[PROSECUTOR]: . . . . [D]efense, you know, ragged about Viola [DeFlores], of course, and I knew that they would. I was as surprised as you were on Tuesday when things came out of her mouth.

. . . .

"[PROSECUTOR]: If the State of Kansas had the opportunity to spend as much time with Ms. [DeFlores] as Defendant Sanchez and the defense attorney before she came in here and testified, we might have known what she was going to try and do when she showed up Tuesday. You know, remember one thing. When Viola [DeFlores] took the stand on Tuesday, she didn't swear to God. She didn't swear to God. She affirmed. It's right there. Check it out. And you know, that is important. You know, you want to know why? Preliminary hearing she swore to God that she would tell the truth. She swore to God.

"[SANCHEZ' COUNSEL]: Judge, I will object. That is not in evidence.

"[PROSECUTOR]: That is in evidence.

"[DEFENSE COUNSEL]: Plus, that is irrelevant because taking an affirmation is the same as taking an oath.

"THE COURT: [Sanchez' counsel] referred to swearing to God several times in his closing and there was evidence in the Court's recollection that she did at the time of preliminary hearing take a regular oath.

"[SANCHEZ' COUNSEL]: No, there wasn't. There was not one—I take exception. I would ask that—

"THE COURT: Well, it's the Court's recollection. Her objection will be overruled. This is closing arguments. Ladies and Gentlemen, again remind you, ladies and gentlemen of the Jury, that these are closing arguments, they're statements of counsel, they are not evidence. If there is anything that is not supported by the evidence, it should be disregarded.

"[DEFENSE COUNSEL]: Your Honor, my objection to affirmation is still sworn testimony. The fact you do not swear to God under the affirmation would infer to these jurors that there is a difference and there is no difference as to sworn testimony.

. . . .

"[PROSECUTOR]: I will tell you why that is important, folks. Because when she got up here on Tuesday, for whatever reason, [taking] that affirmation instead of swearing to God was her attempt to justify making those small alterations in order to get Pedro Sanchez and Eddie Rodriquez Garcia off these charges, and we know she has some kind of motivation to do that. We know that she has been visiting the defendant in jail. We know that these two are like two peas in a pod, and she just doesn't come in here and alter her testimony a little bit in regards to Defendant Sanchez. She did it with Defendant Rodriquez, too. But back on February 3rd of 1994 she had no reason to lie. There was no motivation here. You saw her on the videotape. Does she look drunk to you? Does she look like she saw and knew what happened. Does it look like her memory has been affected in any way? Does it look like the cops are there making her say anything that she doesn't want to say. She had no motivation back then. None. She has motivation now. And it's a motivation that none of us are privy to but these two. These two can probably tell us—

"[SANCHEZ' COUNSEL]: Judge, I will object and that is a statement against the fact that the defendant did not testify. Ask for mistrial.

"[DEFENSE COUNSEL]: Mistrial.

. . . .

[At the bench.]

"[SANCHEZ' COUNSEL]: It is my position, [the prosecutor] made a statement with regard that reflects upon the failure of the defendants to testify in this case. She has questioned whether or not these defendants could tell us what, what Ms. Viola DeFlores would have—what they had said or what they had discussed, and it's an impermissible statement about the failure of the defendants to testify[.] I would ask for a mistrial.

"[DEFENSE COUNSEL]: I would join. I would join.

. . . .

"[PROSECUTOR]: Judge, I think it just came out wrong. I was not trying to comment on their inability to testify. I would do this to the Court. Tell the jury to disregard any comment, that they are not to take into consideration the fact they didn't testify. My comments were not meant to that portion of it. It's really to the mindset of Ms. [DeFlores] and Mr. Sanchez as to her motivation to come in and testify as she did on Tuesday.

. . . .

"THE COURT: Both of your motion[s] for mistrial [are] under advisement. I will advise the jury to disregard the prior statement and remind them of the instructions that they're not to consider any failure to testify . . . ."

The parties do not cite to, nor has our research revealed, any Kansas cases which deal specifically with the issue before this panel. However, Rodriquez-Garcia cites *Government of Virgin Islands v. Petersen*, 553 F.2d 324 (3d Cir. 1977), and *United States v. Kalaydjian*, 784 F.2d 53 (2d Cir. 1986), in support of his argument that the distinction between taking an oath and affirming drawn by the State was improper and misleading. *Petersen* is not particularly helpful. There the court merely refused to admit evidence of a defendant's religious affiliation to show that he eschewed violence.

Although *Kalaydjian* is helpful, it is not factually similar to the instant case. In *Kalaydjian*, the appellants claimed that the district court erred in refusing to permit defense counsel to cross-examine a government witness regarding the witness' reasons for deciding to affirm rather than to swear on the Koran. Defense counsel sought to cross-examine on this matter purportedly to cast doubt on the witness' credibility. The trial court ruled that the requested cross-examination was precluded by Fed. R. Evid. 610, which " 'forecloses inquiry into the religious beliefs or opinions of a witness for the purpose of showing that his character for truthfulness is affected by their nature.' Fed. R. Evid. 610 (Advisory Committee Note)." 784 F.2d 56. Appellants argued that the rule did not prohibit the requested cross-examination because Rule 610 excludes evidence of religious beliefs only, but does not foreclose a party from undermining a witness' credibility based on the witness' religious beliefs. Appellants argued that the rule did not prohibit challenging a witness' credibility based on the witness' refusal to swear on his religion's bible. In rejecting the appellant's distinction, the *Kalaydjian* court stated:

"[A]ppellants' attempt to distinguish between cross-examining a witness regarding his religious beliefs, and cross-examining him regarding conduct that is significant only because of the witness's religious beliefs. . . .

"Appellants desired to cross-examine Ahmad regarding his reasons for refusing to swear on the Koran in order to raise the following inference: if a man is religious, he will be willing to swear on his religion's bible; but if he refuses to swear, his testimony will be untrustworthy. Appellants could not have established that inference successfully unless the district court had allowed them to inquire into the sincerity and genuineness of Ahmad's Muslim beliefs. Indeed, unless appellants were permitted to prove to the jury that Ahmad was a devout Muslim who believed deeply in the Koran, Ahmad's act of refusing to swear on the Koran would have been meaningless to the jury.

". . . The court's ruling was correct because of the possible prejudicial effect that disclosure of such information might have had on the jury. Indeed, in defining the purpose of Rule 610, the District of Columbia Circuit has stated that '[t]he purpose of the rule is to guard against the prejudice which may result from disclosure of a witness's faith.' [Citations omitted.] Moreover, extensive questioning on the collateral issue of Ahmad's religious beliefs might have confused the jury and distracted its attention from the principal task of determining whether appellants had conspired to deal in heroin.

". . . *We see no difference between challenging a witness's credibility by cross-examining him regarding his religious beliefs, and challenging the witness's credibility by cross-examining him regarding an act that is meaningful only when considered in relation to the firmness of the witness's religious beliefs. Both forms of cross-examination require inquiry into the nature of the witness's religious beliefs. . . . Finally, we note that a witness's right to affirm, rather than to swear, as provided by Fed. R. Evid. 603, would be meaningless if a witness, after exercising his right to affirm, could be cross-examined regarding the reasons underlying that decision.*" (Emphasis added.) 784 F.2d at 56-57.

Although the *Kalaydjian* court was concerned with the propriety of cross-examination, the court's reasoning as applied to the present case suggests that the prosecutor's comments were improper and are indistinguishable from a direct reference to a witness' religious beliefs. Given that K.S.A. 60-418 and K.S.A. 54-103 clearly allow either an affirmation or an oath, it was improper for the State to ask DeFlores about her use of one over the other, since it infringes upon DeFlores' religious beliefs or the lack thereof. K.S.A. 60-430 expressly forbids the inquiry into the religious beliefs or opinions of witnesses for the purpose of showing that their credibility is either impaired or enhanced by their religious beliefs or opinions. Moreover, given that both an oath and an affirmation have equal weight in the law, the prosecutor's remarks about

DeFlores' credibility based upon DeFlores' affirmed testimony versus her sworn testimony were clearly improper.

Next, we must determine whether this error was harmless. Because DeFlores was the State's key witness and the only witness to much of the incident, the jury's determination as to which version of her testimony to believe was critical. We reject the State's argument that the trial court's instruction to the jury that the prosecutor's remarks should not be considered as evidence cured the effect of the prosecutor's improper comments. Consequently, we are unable to say beyond a reasonable doubt that the error had little, if any, likelihood of changing the result of the trial. For this reason, we reverse Rodriquez-Garcia's convictions and remand this case for a new trial.

Next, Rodriquez-Garcia argues that the trial court erred in failing to instruct the jury on aggravated assault as a lesser included offense. "A trial court has the affirmative duty to instruct the jury on all lesser included offenses established by the evidence." *State v. Spresser*, 257 Kan. 664, 672, 896 P.2d 1005 (1995).

"In determining whether a lesser crime is a lesser included offense under K.S.A. 21-3107(2)(d), a two-step analysis or two-pronged test has been adopted. The first step is to determine whether all of the statutory elements of the alleged lesser included crime are among the statutory elements required to prove the crime charged. If so, the lesser crime is a lesser included crime of the crime charged. Under the second prong of the test, even if the statutory elements of the lesser crime are not all included in the statutory elements of the crime charged, the lesser crime may still be a lesser included crime under K.S.A. 21-3107(2)(d) if the factual allegations of the charging document and the evidence required to be adduced at trial in order to prove the crime charged would also necessarily prove the lesser crime. *State v. Fike*, 243 Kan. 365, Syl. ¶ 1, 757 P.2d 724 (1988)." *State v. Berberich*, 248 Kan. 854, 857, 811 P.2d 1192 (1991).

Rodriquez-Garcia concedes that he is not entitled to an aggravated assault instruction under the first prong of *Fike*. However, he argues that "[u]nder the second prong of *Fike*, the evidence adduced at trial would necessarily prove aggravated assault as a lesser crime. As charged, the attempted murder depends upon the intentional firing of several gunshots at the reporting party. Given this complaint and charge, an aggravated assault is necessarily proven."

As the State points out, Rodriquez-Garcia fails to distinguish between the evidence which must be presented at trial to prove attempted second-degree murder and additional facts which may make out an additional offense. The State cites *State v. Dixon*, 248 Kan. 776, 811 P.2d 1153 (1991), wherein our Supreme Court addressed a similar issue. In *Dixon*, the defendant argued that aggravated battery was a lesser included offense of attempted first-degree murder because the "information, read in the light of the facts adduced at trial, establish[ed] that [the victim] was actually shot." 248 Kan. at 784. Thus, Dixon reasoned that the State necessarily proved the elements of aggravated battery in establishing the elements of attempted first-degree murder. In rejecting this argument, the *Dixon* court stated:

"Dixon's argument misinterprets the second prong of the test to determine whether an offense is a lesser included offense of a particular crime charged. Under the two-part analysis set forth in [*State v.*] *Adams*[, 242 Kan. 20, 744 P.2d 833 (1987),] and *Fike*, a lesser crime may become a lesser included offense of a greater offense if the information actually alleges a lesser crime and the evidence which *must* be established to prove the crime charged also proves the lesser crime. In this case it was not necessary to prove [the victim] was actually shot to establish the elements of attempted first-degree murder. The State was required to prove only that Dixon committed an overt act towards the perpetration of first-degree murder.

"Dixon's argument fails to distinguish between what the State may prove and what the State is required to prove. [Citation omitted.]" 248 Kan. at 784.

Similarly, in the instant case, the State was not required to prove that DeFlores was placed in apprehension of harm, an element of assault, to prove attempted second-degree murder. Therefore, aggravated assault is not a lesser included offense of attempted second-degree murder, and the trial court did not err in refusing to give the instruction.

Affirmed in part, reversed in part, and remanded for a new trial.